NOT DESIGNATED FOR PUBLICATION

No. 127,184

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of T.C.R., a Minor Child.

MEMORANDUM OPINION

Appeal from Riley District Court; GRANT D. BANNISTER, judge. Submitted without oral argument. Opinion filed September 13, 2024. Affirmed.

*Rebecca R. Rookstool*, of Westmoreland, for appellant.

*David Lowden*, deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., GREEN and HILL, JJ.

PER CURIAM: In this appeal, we must review the record to see if there is clear and convincing evidence that T.C.R., a minor, was, at the time the petition was heard, a child in need of care as defined by law. His mother—the boy's sole caregiver—argues that he was not in need of care and appeals the district court's ruling that he was.

The record shows that when the petition was filed, Mother was going to jail; Father was somewhere out of state; the child was young, has special needs, and is autistic; mother and son were experiencing homelessness; and there were no relatives to keep him. The court's only choice was either placing him in State custody or putting him back on the streets. Can that ever be in the best interests of a young boy with autism? It was in the boy's best interests to find T.C.R. to be a child in need of care and enter the

1

state system for such children. This choice may have saved his life. We affirm the court's finding.

*Mother must go to jail.*

In August 2023, 16-year-old T.C.R. lived with Mother and had been under her care for his entire life. At that time, they alternated between living in Manhattan with T.J.—Mother's adult daughter and T.C.R.'s sister—for three days at a time and staying with other friends and family on other days. On August 22, 2023, Mother learned she would need to serve a 72-hour jail sentence in the Riley County jail but could find nobody willing to care for T.C.R., so she contacted the Riley County Police Department to take T.C.R. into police protective custody. An officer met Mother at T.J.'s home and transported Mother to the jail while another officer transported T.C.R. to the police department.

The next morning Heather Walker, an employee with the Department for Children and Families, met with Mother at the jail for an interview. Mother told Walker she was unsure about her plans upon release, but she believed Father—who lived in Alabama—was on his way to pick them up to return to Alabama. Mother also explained she had been homeschooling T.C.R. for the past several years.

Later that day, the State petitioned to adjudicate T.C.R. as a child in need of care, asserting he:

- was without adequate parental care, control, or subsistence and it was not due solely to the lack of financial means of the parents under K.S.A. 38-2202(d)(1);
- was without the care or control necessary for the child's physical, mental, or emotional health under K.S.A. 38-2202(d)(2); and

- had been physically, mentally, or emotionally abused or neglected or sexually abused under K.S.A. 38-2202(d)(3).

At the temporary custody hearing, Mother was present and represented by counsel, while Father was not present but was represented by counsel. The district court found there was probable cause to believe T.C.R. would sustain harm if not immediately removed from Mother's care and placed T.C.R. in the temporary custody of DCF with out-of-home placement. The court also set a pretrial hearing and an adjudication hearing. DCF placed T.C.R. at a youth ranch in Lawrence, where he also began attending Lawrence High School.

At the adjudication hearing, Mother and Father appeared in person via Zoom, along with their appointed counsel.

*We review the evidence received at the adjudication hearing held about two months after the petition was filed.*

The State's primary witness was Walker, who testified that she was assigned to T.C.R.'s case at intake to assess T.C.R.'s safety once he was taken into police protective custody. Walker met with Mother while she was in jail and learned that T.C.R. had not attended public school for a few years and that Mother homeschooled him. Walker also knew from previous cases and her conversation with Mother that T.C.R. had autism and was a high need child, which concerned Walker since Mother said she had been homeschooling him. Walker believed T.C.R. "should be in public school receiving the services he needs." Yet Walker said she did not inquire about what type of home school program Mother had been using for T.C.R.

Walker also testified that she asked Mother about mental health services, to which Mother explained she had not followed through with the appointments because they were

too early in the day. Although Mother had told Walker that Father was coming from Alabama to get her and T.C.R., Mother also said she was unsure about her plans once she was released from jail. In addition, Father told Walker later that he wanted T.C.R. to stay with Mother "because that's who [he] had grown up with" and believed T.C.R. was safe with Mother. Walker also said Mother had previously called DCF to self-report that "bounty hunters were out after her, and [she] was looking for resources for housing for her and [T.C.R.]." But, at that time Mother refused to accept help from Walker. Walker had recommended DCF custody and out-of-home placement at the temporary custody hearing and that both Mother and T.C.R. engage in mental health services. Walker had to end the interview with Mother at the jail because Mother began to answer questions incoherently and went off topic to blame a judge for putting her in jail. At the State's request and over Mother's objection, the district court admitted copies of T.C.R.'s school records. The State then rested.

*Mother's evidence shows how she cares for her child while having no home.*

Mother then testified on her own behalf, explaining that she was still alternatively living with her daughter T.J. and a friend on the date of the adjudication hearing. Mother could only stay with T.J. for three days at a time because of the rules imposed by T.J.'s landlord, at which point she would alternate to staying with someone else. Mother hoped to move to Lawrence—where T.C.R. was now going to school—to live in the homeless shelter with T.C.R. "[a]s soon as possible." Mother said she planned to have a friend take her there "[a]s soon as I can get there" and that she was "advised not to leave until everything is complete in court." Mother said she could support herself and T.C.R. through the SSI and child support payments they each received, which she estimated to be around $1,900 per month.

When T.C.R. was taken into police protective custody, Mother allowed him to bring a pillow and his cell phone, and there was clothing at T.J.'s house that T.C.R. could

4

have taken. Mother said she didn't have time to get him anything because she wanted to get to the jail to avoid having to spend any more time there. Mother tried to call Father but could not reach him. She believed Father was coming for the weekend.

Mother explained that T.C.R. was making a lot of accomplishments regarding his autism. When T.C.R. was younger, he would not speak and had trouble getting words out. He also had poor hand-eye coordination and did not enjoy playing sports. Mother withdrew T.C.R. from public school in August 2019 to begin homeschooling. She did not complete any paperwork with KDHE to become a nonaccredited private school because she said she "didn't know anything about that." Mother attempted to contact someone she knew who used to oversee the autistic division at the school board but was unsuccessful.

*Mother describes how she cares for her son.*

Mother followed her own curriculum for T.C.R. by consulting family members and teachers she knew. Mother had educational records for T.C.R. from August 2019 to August 2023, but they were not in her possession and she stated that she did not "have any way to get what I have to anyone." Mother said she worked with T.C.R. "four to five hours Monday through Friday," for what "seemed like 365 days [per year] minus weekends because . . . he's always with me, and the world is a school for both of us. You always learn something every day."  Mother later explained that T.C.R. struggled with math, which was normal. They also worked on "English and reading, practicing writing . . . [w]ith a little science here and there and history." Mother further described how they cooked and "would go out of things outside with nature" and that she was "teaching him about [B]lack history for history and keeping him well aware of his culture."

At the time T.C.R. was taken into custody, he was "doing good" and had a ninth grade reading level. Based on a parent-teacher conference Mother attended through Lawrence High, she learned T.C.R. was on an IEP, on target with his peers, and "doing

5

very well."  Mother said she wanted to move to Lawrence and keep T.C.R. in school there because "[h]e loves his school, he loves the ranch, [and] he's made new friends."

Turning to T.C.R.'s mental health, Mother said she stopped taking T.C.R. to Pawnee Mental Health because "[i]t wasn't working for us" and "you have to find the right fit so [she] had to take him elsewhere." Mother began taking T.C.R. to Katie's Way but had to change therapists several times because of turnover.  Mother stopped taking T.C.R. to Katie's Way in March or April 2023, stating that the therapist "wasn't too concerned" and thought T.C.R. "was a good kid and that [they] were doing pretty good so he would just let [Mother] free wing it as [she] needed to."  If Mother moved to Lawrence with T.C.R., she would continue taking T.C.R. to Katie's Way in Manhattan if needed using medical transportation.

Mother next testified about her own health issues, which included a chronic condition that doctors have been unable to diagnose. Mother said she had a lot of pain because of some internal bleeding, heart palpitations, and a pinched nerve in her back. Mother said her health did not prevent her from caring for herself but also acknowledged that her medical complications prevented her from standing for a long time. Mother also said she did not have any mental health diagnoses and her therapist was deceased. Mother did not know the status of the court case that led to her jail stay because "[n]obody is really telling [her] anything."  She denied telling Walker that she had lost housing because of bounty hunters kicking in her door but acknowledged that bounty hunters had come to her house about four months ago.

At the State's request, the district court took judicial notice of Riley County case No. 2021-CR-497, in which T.J. was accused of child endangerment and battery of T.C.R. and interference with law enforcement in December 2021. The child endangerment count was dismissed; T.J. was found guilty of the interference charge and

6

not guilty of the battery charge. The court also took judicial notice of the court file and all court reports that had previously been admitted during the proceedings.

*The court made its findings.*

The district court found T.C.R. to be a child in need of care under K.S.A. 38-2202(d)(1), (d)(2), and (d)(3) as alleged in the State's petition. To support its determinations under subsections (d)(1) and (2), the court mentioned Mother's lack of housing stability, which had not changed in the three months since T.C.R. was removed from Mother's care, and her own health concerns.

The court also found that T.C.R.'s special needs—particularly his educational needs—were not being met before he was taken into custody but were now being properly addressed because of the State's intervention.

Lastly, the court explained that there was no evidence of physical abuse under subsection (d)(3) and "that it would be limited to the mental or emotional and not the other aspects of that particular subsection."

Mother argues the district court erred in adjudicating T.C.R. as a child in need of care, challenging the evidence supporting each of the statutory grounds mentioned in the court's ruling.

*We review—we do not reweigh.*

We are mindful that the question the district court had to answer was simply: Is this boy a child in need of care? In turn, for our review, the question we must answer is simply: Is there sufficient evidence supporting the court's decision?

We review a district court's child-in-need-of-care adjudication by determining whether a rational factfinder could have found it highly probable by clear and convincing evidence that the child was in need of care. We review all the evidence in the light most favorable to the State. We do not reweigh conflicting evidence, pass on the credibility of witnesses, nor do we redetermine questions of fact. See *In re B.D.-Y.,* 286 Kan. 686, 705, 187 P.3d 594 (2008). We exercise unlimited review of any statutory interpretation questions. *In re N.E.*, 316 Kan. 391, 402, 516 P.3d 586 (2022).

Here, the district court used the following definitions from K.S.A. 38-2202(d)(1)-(3) as a guide. Proof of just one of these subsections is sufficient to support a child in need of care adjudication. See *In re F.C.* 313 Kan 31, 44, 482 P.3d 1137 (2021). Under those subsections, the court must ask, does the evidence show whether the child:

> "(1) Is without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the child's parents or other custodian;
> "(2) is without the care or control necessary for the child's physical, mental or emotional health;
> "(3) has been physically, mentally or emotionally abused or neglected or sexually abused." K.S.A. 38-2202(d)(1)-(3).

There is an implicit question of timeliness in these statutes. We recognize that a child's circumstances can change with the passage of time. That means the question arises: Must the State show a child is in need of care at the present moment or at some time in the past? Prior cases have addressed this issue.

Several courts have coped with such questions by using the plain language found in the three statutory subsections. Grammar is their guide. Because subsections (d)(1) and (d)(2) of the law are framed in the present tense, the court's determination depends on "a view of the child's present circumstances existing on the day of the adjudication hearing."

8

*In re D.H.*, 57 Kan. App. 2d 421, Syl. ¶ 4, 453 P.3d 870 (2019). But because subsection (d)(3) is framed in the present perfect tense, the court's determination is based on evidence of abuse or neglect that occurred in the past and the present. *In re F.C.*, 313 Kan. 31, 40-41, 482 P.3d 1137; 57 Kan. App. 2d at 428, 430.

*The court had good reason to make this adjudication.*

We are called to review this evidence and judge whether it supports the court's final finding that T.C.R. is a child in need of care. A fair reading of this record reveals that Mother's circumstances have changed very little after her release from jail even though several months passed before the petition was heard. By law, we are required to review this evidence in the light most favorable to the State.

*First, we make some general observations.*

We observe that when the court heard this petition, Mother had no place to live and no prospects for a stable domicile. Her circumstances are such that she must hang her hat only where others suffer her to live. That may be fine for her, but is that proper for her son? She even suggests to the court that her son could live with her in the homeless shelter in Lawerence so her son could continue attending Lawrence High School. She had, before going to jail, reported to DCF that "bounty hunters were out after her, and [she] was looking for resources for housing for herself and [T.C.R.]." And, when DCF tried to provide resources at that time, Mother refused. This is powerful evidence about Mother's decision-making processes and ability to provide for and protect her son.

*We consider evidence of neglect to be telling.*

Under K.S.A. 2023 Supp. 38-2202(d)(3) a child can be adjudicated a child in need of care when the child "has been physically, mentally or emotionally abused or neglected

9

or sexually abused." The code separately defines "physical, mental or emotional abuse"; "neglect,"; and "sexual abuse." See K.S.A. 2023 Supp. 38-2202(z), (ee), and (mm). Relevant to this appeal, "neglect" under the code is defined as

> "acts or omissions by a parent, guardian or person responsible for the care of a child resulting in harm to a child, or presenting a likelihood of harm, and the acts or omissions are not due solely to the lack of financial means of the child's parents or other custodian." 2023 Supp. K.S.A. 38-2202(z).

The State elected to pursue a need of care determination based solely on neglect. Counsel asked the district court to focus "not [on] physical abuse or neglect but mental neglect due to the education needs and emotional neglect . . . for not having [T.C.R.] in school like he should be, and also just the lack of mental health therapy for him." The court agreed that the State had proven neglect, finding that T.C.R.'s "mental health, emotional health . . . is being neglected without an IEP, a paraprofessional, [and] the regular structure that school provides."

Mother asserts her decision to remove T.C.R. from public school was in her son's best interest, partly because the Manhattan school district did not report T.C.R. for truancy at any time. She also contends the homeschooling curriculum she followed with T.C.R. gave him a "proper education," given that he was now doing well in public school after being removed from her care.

But the only evidence she provides about the specific curriculum is her own testimony, which was not verified in any other way. Even though the evidence presented shows T.C.R. was now doing well academically, it could just as easily be the case that his success was only because the State intervened to provide adequate support and structure to address his educational needs that he was not receiving from Mother alone.

10

To us, Mother takes a similar position when arguing against the district court's findings as they related to T.C.R.'s mental health, asserting that she took him to therapy appointments as needed and tried different therapists until she found him a good fit. Mother also admitted in her testimony that she had not taken T.C.R. to his therapist for several months before the initiation of the child in need of care case because she thought the therapist had said she could "free wing it." But the district court considered the lack of regular therapy to be evidence of neglect given that T.C.R.'s mental health was not being addressed in other ways, such as "an IEP, a paraprofessional, [and] the regular structure that school provides." Mother offers no further explanation to contradict this conclusion.

This is clear and convincing evidence to support the district court's child in need of car finding under K.S.A. 38-2202(d)(3). A rational factfinder viewing this evidence in the light most favorable to the State could conclude that T.C.R. was a child in need of care based on Mother neglecting his mental health and educational needs.

*The evidence relevant to K.S.A. 38-2202(d)(1) and (d)(2) is important but not controlling due to its timeliness.*

We have noted that these two subsections relate to the present moment. In other words, what are the conditions of the child at the date of the adjudication hearing? The only factual findings made by the district court in relation to its need of care determinations under K.S.A. 38-2202(d)(1) and (2) supported by the record are those showing Mother's lack of stable housing at the time of the adjudication hearing. But the court's factual findings related to Mother's mental and physical health, as well as T.C.R.'s homeschool, were based on past circumstances that were no longer present at the time of the adjudication hearing.

11

The court specifically found there was "clear and convincing evidence that [T.C.R.'s] educational needs were not being adequately met prior to this case and they only are now because of what the State's providing while he's in State's custody." By the letter of its ruling, the district court improperly relied on past factual circumstances when it should have been focused on the *present*. And the evidence pertaining to T.C.R.'s present educational circumstances was that he was thriving in public school and receiving the appropriate educational supports. Thus, Mother is correct when she argues that this aspect of the district court's ruling was improper.

Even so, a rational factfinder viewing the evidence about Mother's present housing situation in a light most favorable to the State could conclude that T.C.R. was in need of care because it showed Mother was not presently able to provide adequate parental care or control to address T.C.R.'s needs.

We do not consider the court's error reversible. Our holding is based on the findings made under K.S.A. 38-2202(d)(3).

There is clear and convincing evidence that a rational factfinder could have found it probable that T.C.R. was a child in need of care. The district court was confronted with a difficult decision but acted appropriately in making its finding. It is clear from this record that the district court was concerned about the safety and care of T.C.R.

Affirmed.

12

Gardner, J.: I respectfully dissent, finding no clear and convincing evidence that mother neglected T.C.R.

Clear and convincing evidence is evidence sufficient to establish that the truth of the facts asserted is highly probable. *In re Adoption of C.L.*, 308 Kan. 1268, 1278, 427P.3d 951 (2018). See *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008).

The clear and convincing evidence standard sets a high bar for good reason:

"[A]s a parent, [Mother] has a fundamental liberty interest in the right to make decisions regarding the care, custody, and control of her children. This principle is without dispute. See *In re J.D.C.*, 284 Kan. [155,] 166, 159 P.3d 974 [(2007)] (citing *Troxel v. Granville*, 530 U.S. 57, 65-66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 [2000]; *Sheppard v. Sheppard*, 230 Kan. 146, 152, 630 P.2d 1121 [1981], *cert. denied* 455 U.S. 919 [1982])." *In re A.A.-F.*, 310 Kan. 125, 145-46, 444 P.3d 938 (2019).

The government should not interfere with that parental interest lightly. But at times, the State may seek to protect the welfare of children by asserting "processes designed to protect children in need of care." 310 Kan. at 146.

The majority affirms only the district court's finding under K.S.A. 38-2202(d)(3) that T.C.R.'s mental or emotional health was neglected. Under the definition of "neglect," the State bears the burden to show clear and convincing evidence that Mother's acts or omissions resulted in harm to T.C.R. or presented a likelihood of harm to him and are not due solely to the lack of her financial means. K.S.A. 2023 Supp. 38-2202(z). I cannot agree that the record shows clear and convincing evidence of neglect.

The majority finds that Mother neglected T.C.R.'s educational needs. As to this, the court found that T.C.R.'s "mental health, [and] emotional health . . . is being neglected without an IEP, a paraprofessional, [and] the regular structure that school provides." But no evidence shows that T.C.R. needed an IEP, a paraprofessional, or the regular structure that school provides. No expert so testified. The closest testimony is from Heather Walker, a Kansas Department for Children and Families staffer, who testified that because T.C.R. is autistic, he should be in public school. But she did not show any awareness of the degree of autism T.C.R. has, and, despite the wide spectrum of abilities in children who have autism, lumped all autistic children together in her conclusion. And because she stated no basis of knowledge for that broad conclusion, perhaps she knows nothing at all about the education of autistic children. She certainly had no knowledge about T.C.R.'s education, as she readily admitted that she did not ask Mother what type of homeschool program Mother was using for T.C.R., that she had no knowledge of T.C.R.'s homeschool curriculum, and that not all autistic children need special mental health services.

No evidence showed that T.C.R. had an IEP, or a paraprofessional when he attended public school before Mother pulled him out to be homeschooled for the three years before the CINC hearing. Although T.C.R. was apparently on the autism spectrum, no evidence shows the severity of T.C.R.'s autism or provides any evidentiary basis for a rational inference that T.C.R. needs an IEP, a paraprofessional, or the structure public school provides. So it is just as plausible to speculate that the best education for T.C.R., because of his autism, is to be taught one-on-one by someone who loves him and thoroughly understands his special needs and has time to accommodate them—his mother.

Most of the testimony about T.C.R.'s education was from Mother. The majority discounts Mother's testimony because "the only evidence she provides about the specific curriculum is her own testimony, which was not verified in any other way." Slip op. at

14

10. But Mother's testimony was uncontradicted and the district court did not find it lacked credibility. And because the burden is on the State to show clear and convincing evidence of neglect, Mother did not need to testify or verify her testimony in any way.

Still, Mother did so, explaining that T.C.R. had made many accomplishments regarding his autism. Mother followed her own curriculum for T.C.R. by consulting family members and teachers she knew. Mother kept educational records for T.C.R. from August 2019 to August 2023, during the time she homeschooled him. And the district court admitted copies of T.C.R.'s school records. She worked with T.C.R. "four to five hours Monday through Friday," for what "seemed like 365 days [per year] minus weekends" because they were always together. She explained that T.C.R. studied math, English, reading, writing, science, and history. Mother taught him practical skills as well, such as cooking and exploring nature. Mother added that "the world is a school for both of us. You always learn something every day." This uncontradicted evidence shows that Mother was educating T.C.R.

Kansas law does not require that a homeschool be accredited, so no inference of neglect can flow from the fact that Mother's homeschool was not accredited.

And no evidence showed that T.C.R.'s condition was so severe or that Mother's educational efforts were so inadequate as to constitute neglect by Mother. No evidence suggests that T.C.R. was harmed or was likely to be harmed by his homeschooling, as is necessary to find "neglect." As the majority states, when T.C.R. was taken into custody and placed into public school, he was doing well and had a ninth grade reading level. He was on target with his peers and was doing very well academically. Slip op. at 5. So Mother's homeschooling apparently kept T.C.R. on target for his grade level without an IEP, without a paraprofessional, and without a regular public school schedule.

15

The majority speculates that even though the evidence shows T.C.R. was doing well academically, "it could just as easily be the case that his success was only because the State intervened to provide adequate support and structure to address his educational needs that he was not receiving from Mother alone." Slip op. at 11. But we cannot base a decision in a CINC case on speculation. And I cannot agree that it is more reasonable to suppose that T.C.R. regained in one or two months at public school what he had lost during three years of homeschooling, than to suppose that T.C.R. did well academically during a couple of months in public school because Mother had kept him at grade level by homeschooling him for three years.

The record shows the same evidentiary abyss as to the conclusion that Mother neglected T.C.R.'s mental health. On this topic, as above, the relevant testimony was from Walker and from Mother. Walker testified that not all autistic children need special mental health services. That testimony was uncontradicted, yet nothing showed that T.C.R. was among the children that do need mental health services.

Still, Mother testified that she took T.C.R. to Pawnee Mental Health, then took him elsewhere to find the right fit. She first took him to Katie's Way but had to change therapists several times because of staff turnover. Mother stopped taking T.C.R. there in March or April 2023, a few months before the CINC hearing, because the therapist was not too concerned. The therapist told Mother he thought T.C.R. was doing pretty well so he would let Mother bring T.C.R. in as she needed to. The evidence thus shows that Mother took care of any mental health need that T.C.R. may have had and that she did not violate any therapist's recommendation by not taking T.C.R. for mental health services in May-July 2023. Mother's testimony was uncontradicted and was not found to lack credibility.

Despite that evidence, the district court found the lack of regular therapy was neglectful because T.C.R.'s mental health was not being addressed in other ways, such as

16

an IEP, a paraprofessional, and the regular structure that school provides. But, as detailed above, no evidence shows that T.C.R. needed those things. The court's speculation is contradicted by the sole evidence on that issue—that not all autistic children need special mental health services, and that T.C.R.'s most recent therapist told Mother she could bring him in as she deemed necessary. The majority finds it sufficient that "Mother offers no further explanation to contradict the district court's conclusion." Slip op. at 11. Yet Mother does not bear the burden of proof and no evidence supports the court's findings of neglect.

Mother was homeless but did all she could to find care for her son when she had to serve a three-day jail sentence. Because no evidence meets the State's burden to show clear and convincing evidence that Mother mentally or emotionally harmed her son or was likely to do so, I would reverse.

17